5 So.2d 82

**KENDRICK v. CITY OF BIRMINGHAM et al.**

**6 Div. 954.**

Supreme Court of Alabama.

Dec. 18, 1941.

Lawrence Dumas, Jr., of Birmingham, for appellant.

Jas. H. Willis, of Birmingham, for appellees.

FOSTER, Justice.

The question on this appeal is the right of the City of Birmingham to proceed with its proposal to issue bonds of said city under the supposed authority of the General Laws of Alabama and its Constitution. The bonds to be issued are proposed to be in accordance with Chapter 6, Article 2, subdivision 1 of the Code of 1940, Title 37, beginning with section 274.

The election was ordered as required by section 275, supra, and section 222 of the Constitution. Among the purposes for which such bonds may be issued as set out in section 276, one is for "constructing or acquiring by purchase or otherwise water, * * * plants and systems, * * * and of constructing enlargements and extensions to any such plants or systems." The proposed issue of bonds will be the general obligation of the city, "to be secured by the full faith and credit of the said city of Birmingham * * * and to be further secured by a pledge of the net revenues of the aforesaid system." (Section 10 of the original bill.)

The proposed issue of bonds is not to be done without an election, under authority of section 287, supra. True, under its terms, general obligation bonds may be issued without an election to refund outstanding general obligation bonds, but this may not be done to refund revenue bonds which were issued without an election. It is also true that revenue bonds are now to be called in and paid, with the consent of the owner of them without penalty, by the use of the proceeds of the presently proposed issue, which is in substance a refunding operation. But section 287, supra, does not prevent such operation when the new bonds are to be issued pursuant to an elec-

tion. This conforms to section 222, Constitution, which requires an election for the issuance of general obligation bonds, except for those issued to refund general obligation bonds which had been lawfully issued.

The present proposal does not refund general obligation bonds, and therefore they cannot issue without an election under section 222, Constitution. But section 287, supra, does not prevent the city from issuing general obligation bonds pursuant to an election and using the bonds to pay outstanding revenue bonds, nor refunding such bonds. So that it has no controlling importance here. It will not be violated by this proposal. Likewise, section 325, Code, contemplates a refunding of revenue bonds with revenue bonds, but there is no prohibition against refunding them with general obligation bonds pursuant to an election, if otherwise authorized by law.

Since the new bonds are not to be revenue bonds, and not refunding bonds in the sense that such bonds may be issued without an election, the question is whether or not general obligation bonds may be issued under Chapter 6, subdivision 1 of Article 2, Title 37, Code of 1940, after an election is held, to obtain funds with which (1) to pay revenue bonds not the general obligation of the city, but which are payable only out of the revenues derived from an industrial waterworks system which is owned by the city and was partly paid for with the funds derived from such revenue bonds, and (2) to pay for improvements to that system.

The answer to that question calls for an answer to others. One additional question is whether the payment of (a) revenue bonds with the proceeds of those now to be issued can be said to be for constructing or acquiring by purchase or otherwise a water plant or system, and (b) whether constructing enlargements and extensions to any such plant is contemplated in the use of such bonds upon a proper interpretation of section 276, supra; and another such additional question is whether by the issuance of general obligation bonds the debt limitation of section 225, Constitution, will be violated?

The bonds now sought to be paid were issued under authority of acts of the legislature which have since been inserted in the Code of 1940, Title 37, Article 2, subdivision 3, beginning with section 308, to which we will refer for convenience as the Kelly Act. They are termed revenue bonds and

are not the general obligation of the city. They were issued to secure funds to aid in the construction by the city of an industrial water system for Birmingham and vicinity. In May, 1937, the city commission passed an ordinance authorizing the construction of "a waterworks and water supply system for industrial use," and provided for the issue of revenue bonds pursuant to the said Kelly Act. Section 312 of the Code of 1940, Title 37 (the Kelly Act), provides that such bonds shall not constitute an indebtedness of the city, and shall be payable solely from the revenue of the waterworks system. The bonds so stipulated. Section 313, supra, provides for a statutory mortgage lien on such system. Section 314, supra, provides that the system shall remain subject to such statutory mortgage lien until the bonds are fully paid. By section 315, supra, on default in the payment of the principal or interest upon any of the bonds, a receiver may be appointed to administer and operate the system with power to fix and charge rates and collect revenues sufficient to provide for the payment of any bonds outstanding and expenses of operation. By section 325, supra, the revenue bonds so described may be refunded by "revenue refunding bonds."

Until those bonds are paid all funds derived from the operation of the system shall be received and paid out by a custodian, and shall be used in connection with the operation of it and to pay the bonds, and are not subject to other disposition as long as any of them are outstanding. Subject to such conditions, the system is owned and operated by the city for industrial purposes, for which use alone the water is fit.

The two next succeeding paragraphs are taken with approval from Mr. Justice Brown's opinion in this cause:

"The defendant municipality has defaulted in some of its payments of principal and interest, and the owner of the bonds has agreed to allow redemption by the payment of principal and interest without the penalty of 3% provided in the bonds as a condition to the right of the payor to call the same.

"It has been consistently ruled here that revenue bonds issued under the Kelly Act, the presently pertinent provisions of which are embodied in §§ 312, 325 and 334 of Tit. 37, Code of 1940, are not a debt of the municipality issuing the same, and that such obligation must be payable solely out of revenues arising from the operation of systems, the acquisition or construction of which are herein provided for. The statutes so expressly provide. Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859; Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A.L.R. 1381; Smith v. Town of Guin et al., 229 Ala. 61, 155 So. 865; Code of 1940, Tit. 37, § 312." 5 So.2d 88.

The provision of law that such revenue bonds must be payable solely out of revenues arising from the operation of the system is necessary so that they may not be considered a general obligation of the city under section 225, Constitution, and so that an election shall not be necessary under section 222, Constitution. Bankhead v. Town of Sulligent, supra.

Neither the Constitution nor other legal enactment prohibits the city from voluntarily using unincumbered funds derived from any source to pay the bonds. Wheelis v. Phenix City, 241 Ala. 310, 2 So. 2d 776(3); Bankhead v. Town of Sulligent, supra. But only that a payment cannot be enforced from any fund except such revenues, and if so a debt is thereby created. There being no prohibition, the inquiry then arises, Where is the authority to pay money which the city does not personally owe, and which in fact no one owes? No personal judgment may be rendered against anyone.

It is claimed that the authority to pay such bonds cannot be derived from section 276, supra, and that if it could be so derived, the limitations of section 225, Constitution, would prohibit the city from issuing general obligation bonds to obtain money to do so. The contention as to section 225, supra, is that Birmingham has a population of over six thousand, and, therefore, the debt limit for it is seven percent. of the assessed value of the property in it, and that, though there is excepted from the operation of that limit bonds which may be issued for the purpose of acquiring, providing or constructing waterworks, such exception has no application here for two reasons: (1) that to pay the revenue bonds here in question is not acquiring, providing or constructing waterworks, and (2) if it were so considered, section 225, Constitution, contemplates only domestic waterworks and not an industrial system here under consideration.

The first aspect of this inquiry as to section 225, Constitution, is the same as that affected by section 276, Code of 1940, supra. For the justification for issuing the general

obligation bonds under section 276, supra, here proposed, is the acquiring or constructing a waterworks plant or system; and the only reason why they would not exceed the debt limit of section 225, Constitution, is because they are to be for that purpose.

We have observed that in 1937, the city commission passed an ordinance for the construction of an industrial waterworks and supply system. They might have issued and sold general obligations of the city under section 276, supra, upon holding an election, without violating section 225, Constitution, if such a system is "waterworks," as stated in that provision of the Constitution. For reasons not now important, if we knew them, it was decided not to do so, but to issue revenue bonds under the Kelly Act, where no election was necessary, and no general obligation incurred.

We must assume that the plan was intended to acquire unlimited ownership upon the final payment of the revenue bonds. That set up contained features whereby the operation of the system could be taken away from the city and placed in the hands of a receiver, who was required to make such charges and rates as to secure enough funds to pay the bonds. It may be assumed that the city was interested in having its many large and small industries supplied with water for requirements in their industrial plants at such rates as to aid them in operating on a sound economical basis, so as to justify their continued existence. We may also assume that the purpose was not to earn money for the general fund of the city treasury.

The bill alleges that default has occurred in paying those bonds. This means that the revenues derived from the operation are not sufficient, and unless something is done about it, the result to be expected is a receivership, raising water rates, burdening such industry so important to the public welfare of Birmingham.

If the city had the unincumbered funds in its general treasury, would there be any doubt of its power to lift such a burden off of its property? But even so, would it be thereby acquiring or constructing a waterworks system, the title to which is now in the city? This may well be answered by contemplating the whole situation as the continuation of the original plan to acquire this system. Certainly the act (section 276, supra) contemplated authority to acquire

complete ownership, not a limited ownership. And it did not require that this be all accomplished in a single step. The city was authorized to move along toward such complete ownership by pursuing such steps provided by law as in its judgment would be to the best interest of the people to be affected. The Kelly Act authorized a limited ownership, which could become burdensome to the city's economic status as it has become, but would not require the same restrictions as are prescribed for a general obligation bond issue. The status of the city in that respect would be somewhat like buying property incumbered without the purchaser assuming the debt. Another illustration, similar in equity, is that of a purchaser under a lease sale contract with no obligation to pay the debt.

If at any time it would be apparent that it would be sound economy to pay the debt and acquire unlimited and unconditional ownership and possession, is that any more than taking the final step in acquiring full ownership of the property? That is the view we take of it. But it is said that to do so, the new bonds will not only be general obligations but it is proposed to pledge the revenue to secure them.

The same illustrations answer that suggestion. For in paying off the purchase money incumbrance it is none the less such act because the funds are procured by some other financial setup which may include a new incumbrance on the property. The revenue bonds are essentially purchase money bonds. Paying them is but the payment of purchase money, and it is none the less so because a new mortgage is made to procure the funds. We think it is a correct statement to make, that a payment of the purchase price is in legal effect the use of funds in acquiring the property for which the price is paid, though such payment is long delayed and takes a change of form. So that when the city borrowed money with the revenue bonds and used it in constructing a waterworks, it could be said conformably with section 276, supra, and section 225, Constitution, that in paying those bonds the city is virtually thereby acquiring its system freed from the burden of the debt for the purchase price. The issuance of the revenue bonds being theoretically simultaneous with the construction of the system, it means that the city has never become the unrestricted owner of it.

The fact that in raising funds to free it from that limitation, it will again pledge

the revenues, does not militate against this theory. The new pledge or lien is on a different basis, different conditions as to operation and rates and interest and other requirements, all thought to be more advantageous than the present setup. It is only another step in the plan ultimately to acquire unconditionally and without incumbrance this system, as will be true when these bonds are paid from the general resources of the city.

The system will not be fully acquired until the entire purchase price is paid. And bonds whose purpose it is to raise funds to pay other bonds issued to provide money to construct the system are essentially bonds to acquire that system.

Section 251, Code of 1940, Title 37, authorizes a city to mortgage its waterworks plant to secure bonds created in the purchase or construction or enlargement of the system. This means to secure the debt created for such purpose, and continues as long as that debt is unpaid, regardless of the different forms in which it may be placed.

We are not at all impressed that because this section and section 276 do not expressly mention a waterworks system for industrial purposes, as does the Kelly Act, but only in general terms refer to a waterworks plant, that there is any reason to assume that the use of the water so derived was only intended for domestic use, on the theory that no such plant was then in the contemplation of the legislature. The same is also true as to the use of the term in section 225, Constitution. It may be that when sections 251 and 276 were enacted and the Constitution was adopted, there was no such system in Alabama as a purely industrial water system. But we know as a matter of common knowledge that all water systems then supplied service for industrial as well as domestic use. And when the term waterworks is used, we see no reason why it should be limited to only one aspect of its then uses. We think it should not be so limited. We know many instances where the broad language of the Constitution, state and federal, has been properly extended to situations within its terms, though not in the contemplation of the framers of the Constitution nor of the people in adopting it: such as due process, equal protection of the laws, privileges and immunities of citizens, interstate commerce, post-roads, etc.—The books are full of them.

The provisions in section 251 and 276, Code of 1940, supra, should not be limited as to the purchase price nor as to enlargements and extensions to domestic waterworks, and neither should the exceptions in section 225, Constitution, in respect to the debt limit of cities there described.

We cannot agree with another contention of appellant that the payment of interest on the revenue bonds which are in default, is not in the same category as a payment of the principal of them for the purpose now under consideration. Such payment is necessary to get the property from under the statutory mortgage outstanding upon it, and is in the nature of cost to the city for its acquisition, though not a personal debt of the city. Its payment is a condition to the complete ownership of the property by the city.

Neither can we agree that because interest is to be paid out of the proceeds of sale, there will be a double proposition submitted for a single vote. The single purpose for voting is the issuance of the bonds to pay off the conditions necessary to the acquisition of the plant. Because those conditions include both principal and interest that circumstance does not double the proposition submitted to a vote. Compare, Coleman v. Eutaw, 157 Ala. 327, 47 So. 703; Tommie v. Gadsden, 229 Ala. 521, 158 So. 763.

Again the contention is made that although there are two proposals to be separately voted (1) to refinance the unpaid construction cost and interest, and (2) to raise money with which to make additions and improvements to it, which will increase its effectiveness so as to add materially to its value, they cannot thus be separated, upon the theory that it is a single proposition which cannot be separated. There is no plausible reason advanced why the city by a proper election cannot vote on the two proposals separately. One important reason for separating them is that the larger one is for refunding purposes and is not subject to the restrictions of section 255, Title 37, Code of 1940. Whereas, the smaller is for the purpose of raising new money with which to make improvements, and is not for refunding purposes, and is therefore subject to those restrictions.

Section 270, Code, supra, is full authority for the pledge of the net revenue of the industrial system to secure the proposed bond issue.

We have given due consideration to the contentions made by appellant on this appeal, and, in our opinion, none of them are sufficient to cause the proposed issue to be held in violation of the provisions of law and the Constitution, to which we have referred. Such was the decree of the trial court, and it is affirmed.

Affirmed.

GARDNER, C. J., and THOMAS, BOULDIN and LIVINGSTON, JJ., concur.

BROWN, J., dissents in part.

BROWN, Justice (dissenting in part).

This is a proceeding instituted in a court, of law, under the Declaratory Judgment Act, now §§ 156–168, inclusive, Code of 1940, Title 7, by a citizen and taxpayer of the city of Birmingham against said city and others, asserting that said municipal corporation has no authority to vote and issue general obligation bonds to refund revenue bonds issued under and in pursuance of the Kelly Act and its amendments, brought forward in the Code of 1940, as subdivision 3 of Article 2, Tit. 37, §§ 308 to 340, inclusive. Said revenue bonds were issued to fund a "WPA Project", to acquire lands, rights of way and construct, with aid furnished by the United States through WPA, an Industrial Water System for Birmingham and vicinity. Also questioning the validity of the ordinance under § 222 of the Constitution of 1901, calling the election in said city for authority to issue general obligation bonds to refund revenue bonds, and also bonds to provide funds for building a boosting system as an adjunct to the Industrial Water System, to accelerate the water flow.

Sundry reasons are stated in the last paragraph of the petition, as mere conclusions of law, to sustain the petitioner's contentions.

The defendants, without testing the sufficiency of the petition's averments, filed an answer admitting the truth of said averments, but denied the pleader's conclusions of law, and the controversy was submitted to the circuit court on the admitted averments of the petition, without evidence, as the bill of exceptions states.

The averments of the petition, therefore will be construed liberally in favor of the petitioner, and legitimate inference arising from the facts stated will be taken into account in disposing of the controversy.

The project was completed in 1938, and the revenue bonds were issued in pursuance of said act in the aggregate sum of $4,000,-000, ·and the funds acquired thereby, together with from five to six million dollars furnished by the Works Progress Administration, were used in completing said project. The bonds draw interest at the rate of 4% per annum, payable semiannually, and mature, respectively, on the 1st of April of each year, beginning with April 1, 1941, up to April 1, 1981, and are held and owned by the United States through the Reconstruction Finance Corporation. These bonds are secured by a pledge of the entire revenue arising from the operation of said Industrial System, and a "statutory mortgage" on the plant as contemplated and authorized by said Kelly Act. Embodied in each of said bonds is the following paragraph: "Neither this nor the other Bonds of this issue constitute *an indebtedness of the City of Birmingham* within any constitutional provision or statutory limitation of the State of Alabama, nor are they 'bonds' within the meaning of Section 222 of the Constitution of Alabama. It is hereby recited, certified and declared that no property or funds of the City of Birmingham have been used in connection with the Project costs, and the City of Birmingham has undertaken no obligation to complete the Project or to contribute any property or services or to pay any cost in connection therewith except from the proceeds of this and the other Bonds of this issue." (Italics supplied.)

The Industrial System is owned and operated by the City of Birmingham in accordance with said Kelly Act. The water impounded and controlled by said system is rendered unfit for human consumption, and is furnished to industrial plants, firms and corporations, on rates fixed and charged by the city. Among such privately owned industries, supplied in part, is the Birmingham Water Works, a privately owned corporation, which purifies and furnishes water to the citizens of Birmingham for domestic and other uses. It owns its own supply system but purchases from the Industrial System under a non-competitive agreement, within the spirit of the Kelly Act. Code of 1940, Tit. 37, § 308.

The defendant municipality has defaulted in some of its payments of principal and interest, and the owner of the bonds has,

agreed to allow redemption by the payment of principal and interest without the penalty of 3% provided in the bonds as a condition to the right of the payor to call the same.

It has been consistently ruled here that revenue bonds issued under the Kelly Act, the presently pertinent provisions of which are embodied in §§ 312, 325 and 334 of Tit. 37, Code of 1940, are not a debt of the municipality issuing the same, and that such obligation must be payable solely out of revenues arising from the operation of systems, the acquisition or construction of which are herein provided for. The statutes so expressly provide. Oppenheim v. City of Florence, 229 Ala. 50, 155 So. 859; Bankhead v. Town of Sulligent, 229 Ala. 45, 155 So. 869, 96 A.L.R. 1381; Smith v. Town of Guin et al., 229 Ala. 61, 155 So. 865; Code of 1940, Tit. 37, § 312.

The statute also expressly provides that refunding bonds issued to refund such previously issued revenue bonds under said act "shall be payable solely from the revenues derived from the operation of the combined system." Code of 1940, Tit. 37, §§ 312, 325.

Nor can such authority be found in subdivision 1 of article 2, Tit. 37, embracing §§ 275 to 292 et seq., for issuing general obligation bonds to refund revenue bonds issued under the provisions of the Kelly Act. This subdivision deals with "Public Improvement Bonds."

Section 275, provides: "The governing body of any municipality in this state may order elections to be held in such municipality, voting upon and deciding the question as to whether or not the bonds of such municipality shall be issued for such purposes *as are authorized by law,* whenever such governing body deems this necessary." (Italics supplied.)

Said subdivision 1 deals with the debt contracting powers of municipalities. Section 276, enumerates the obligations for which the municipality may issue bonds, specifying among others: "For the funding of floating debts; for the funding of interest on debts whether such debts are represented by bonds, notes, interest coupons, or other obligations; for the funding of such amount or portion of any judgment rendered against the municipality as represents either principal or interest or both principal and interest of any bonded or other indebtedness of the municipality, together with any unpaid interest then accrued on such amount or such portion of

such judgment." Code of 1940, § 276, p. 517, Tit. 37.

The section of said subdivision 1 of article 2, which provides for the issuance of refunding bonds, contains the following: "The provisions of this section shall not apply to revenue bonds issued under this title." Code of 1940, Tit. 37, § 287.

Appellee, municipality, rests his case upon the "General Provisions" embodied in Chapter 6, Article 1, Tit. 37, embracing §§ 251 to 273 et seq.; and more especially, §. 253, which deals with "Refinancing Indebtedness" and provides, inter alia; "The governing body of any county, city, or town which shall authorize the issuance of refunding or funding bonds may exercise all powers deemed necessary by such governing body for the execution and fulfillment of any plan or agreement for the settlement, adjustment, refunding or funding *of the* indebtedness of such county, city or town, *not inconsistent with the provisions of law* relating to the issuance of refunding or funding bonds."

As clearly appears this statute deals specifically with the indebtedness of the county, city or town, and not with obligations that are not debts and are payable out of revenues arising from the operations of a particular project or system. To apply these powers to refunding revenue bonds issued under the Kelly Act would be inconsistent with the provisions of said act.

The conclusion therefore is that the proposed issue of refunding bonds is not authorized by law and is ultra vires the city's corporate power.

The ordinance calling the election presents two proposals to the electorate; first, shall the municipality issue general obligation bonds for the sum of $4,120,000, to refund revenue bonds issued under the Kelly Act dealt with above; and, second, shall the municipality issue general obligation bonds to purchase and install equipment for boosting the flow of the water through the Industrial System?

The idea of industrial water system or waterworks, as appellee recognizes, was introduced into our law by the Kelly Act which provides: "The term 'industrial' when used herein to describe a waterworks or water system means a waterworks or water system designed to supply water primarily for use other than human consumption." Code of 1940, Tit. 37, § 308.

The Industrial Water System about which we are concerned here is in the class.

first mentioned, and as before stated is owned by the City of Birmingham.

The revenue bonds issued to establish it are secured by a pledge of the revenues arising from its operation and a statutory mortgage which can not be foreclosed so as to sell the system and deprive the municipality of its ownership. Such mortgage and the pledge of the revenues can only be enforced by the appointment of a receiver by a court of equity to operate the system, collect the revenues and apply the same to the payment of the revenue bonds. Code of 1940, Tit. 37, §§ 313, 314 and 315; Bankhead v. Town of Sulligent, supra.

Section 251, Code of 1940, Tit. 37, dealing with "Power of municipal corporations to secure payment of bonds for school buildings, waterworks, gas, etc., plants," provides: "Any city or town of the State of Alabama that may hereafter construct or purchase school buildings, a waterworks plant, gas plant, electric light plant, or other light and power plant, or extend or enlarge a waterworks plant, or light and power plant, then owned by such city or town, may, by its board of mayor and aldermen, or other governing body of such city or town, execute a mortgage on the school buildings, the waterworks plant, or light and power plant, purchased or constructed by such city or town, to secure the bonds and indebtedness, and interest on such bonds and indebtedness created in the purchase, construction, extension, or enlargement of such school buildings, waterworks plant, or light and power plant, such mortgage to be signed by the mayor, and countersigned by the clerk of said city or town or by such other person or persons as the mayor and aldermen, or the governing body of such city or town may direct by appropriate resolution. If, in the judgment of said board of mayor and alderman, or the governing body of said city or town, it is desirable that such mortgage be executed before such school buildings or plant is constructed, and if it is so executed, for the purpose of providing money to construct such plant, the fact that such mortgage is executed before the construction of such buildings and plant shall not render such mortgage invalid."

This section deals with domestic waterworks plants, designed to furnish water for domestic use and human consumption. Prior to the Kelly Act, the Legislature, and we add the Constitution makers, to adopt the language of the New York court in People v. Hamilton, 227 App.Div. 356, 238 N.Y.S. 81, 82, "When the Legislature has used the word 'Waterworks' it has been in relation to the supply water for domestic and drinking purposes of cities, villages, towns, and water supply districts." Said section does not authorize the issuance of bonds, secured by contract mortgage, and subject to foreclosure by sale of the property, for additions to the Industrial Waterworks System, brought into existence in pursuance of the provisions of the Kelly Act. Code of 1940, Tit. 37, §§ 308–340.

Section 324 of said subdivision 3 (the Kelly Act) authorizes the issuance of "additional bonds" for "improving, enlarging, extending, or repairing any such system or combined system pursuant to the provisions of this subdivision." Fuller v. City of Cullman, 240 Ala. 309, 199 So. 2.

The refunding bonds, the issuance of which was approved, in Lang v. City of Mobile et al., 239 Ala. 331, 195 So. 248, 253, it was shown by evidence and found as a fact "That the facilities which the city proposes to lease to the Department of State Docks and Terminals would in themselves produce revenues yearly sufficient to pay the proposed rental and in addition would produce a revenue for the state as a part of its general operating revenue; that the use of the said facilities to be acquired under the proposed lease would effect economies and increase the efficient operation of the existing state-owned facilities; and that the annual rentals to be paid under the proposed lease will be sufficient to amortize the refunding bonds as they mature, both as to principal and interest; and that the rentals will be paid out of the revenues to be derived from this operation of leased facilities, or from the general gross operating revenue derived by the state from the state-owned marine terminals." Such revenues being pledged to the payment of said refunding bonds.

If the United States acting through the Works Progress Administration had invisioned that the City of Birmingham would, within three years from the completion of this Industrial Waterworks System, undertake to so incumber it by mortgage or other general obligations that it might eventually be sold into the hands of private interest, I doubt not that it would have refused to invest six million dollars therein to aid in its construction.

I concur in the majority holding that the ordinance does not violate § 222 of the Constitution by distinctly submitting two pro-

positions to be voted for in one election. On the other questions I respectfully dissent for reasons stated in the foregoing opinion.